Filed 4/24/25

CERTIFIED FOR PUBLICATION


COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| In re the Marriage of CHRISTINA DeBENEDETTI and MORGAN ENSBURG. | |
| | D082801 |
| CHRISTINA DeBENEDETTI, | |
| Respondent, | (Super. Ct. No. 17FL000014N) |
| v. | |
| MORGAN ENSBURG, | |
| Appellant. | |


APPEAL from postjudgment orders of the Superior Court of San Diego County, Christine K. Goldsmith and Victor M. Torres, Judges.  Affirmed.

Bickford Blado & Botros and Andrew J. Botros for Appellant.

Complex Appellate Litigation Group, Gregory R. Ellis and Kelly A. Woodruff; Dick & Wagner and Stephen J. Wagner for Respondent.

## I. INTRODUCTION

Retirement accounts, such as pensions, that are governed by the Employment Retirement Income Security Act of 1974 (29 U.S.C. § 1001, et seq.; (ERISA)), are generally not assignable.  An exception to this rule is an

assignment of all or part of a pension benefit payment pursuant to a Qualified Domestic Relations Order (QDRO). A QDRO is defined, in part, as a " 'domestic relations order' " relating "to the provision of . . . marital property rights" that creates "the existence of an alternate [retirement plan] payee." (29 U.S.C. § 1056(d)(3)(B).) For our purposes an ex-spouse is generally the alternate payee.

In this case, the trial judge[1] assigned four of Morgan's[2] ERISA governed retirement accounts to Christina, issuing a separate QDRO for each.[3] The trial judge signed these domestic orders to satisfy an award made against Morgan after a marital dissolution judgment included findings that Morgan breached his fiduciary duty to Christina. The judgment compensated Christina for the money she lost resulting from that breach by ordering Morgan to reimburse Christina for her missing community property share, and for related attorney fees. The total amount the trial judge ordered exceeded $2 million.

Morgan argues four issues on appeal. First, Morgan asserts the disputed QDROs do not relate to the provision of "marital property rights" because that phrase must be construed narrowly and is limited to the division of the community interests in a pension, as opposed to enforcing damages for a breach of fiduciary duty. Second, the amended QDROs

---

[1] During this matter the parties agreed to use a privately compensated temporary judge. (See Cal. Const., art. VI, § 21; Cal. Rules of Court, rules 2.830 et seq.) We use the terms "trial court" or "trial judge" to refer to her.

[2] As is traditional in family law cases, for clarity we refer to the parties by their first names. No disrespect is intended. (See *In re Marriage of Loyd* (2003) 106 Cal.App.4th 754, 756, fn. 1.)

[3] These QDROs amended the original QDROs signed by the trial judge earlier in the case.

contravene ERISA's primary purpose of protecting retirement income for both spouses. Third, Morgan maintains the QDROs are invalid under California law because they violate Family Code[4] section 2610 and Code of Civil Procedure section 704.115, and they redivide marital property after a final dissolution judgment. Finally, Morgan argues the orders are unsupported because the trial court never valued the retirement accounts which would fund the new QDROs to determine the accuracy and fairness of its order.

We reject Morgan's contentions. We find "marital property rights" includes hidden and squandered community property obligations owed by one spouse to another, that the new orders comply with ERISA's QDRO provisions making them appropriate to use for enforcing collection on Christina's award, and that the California laws Morgan cites to support his arguments are either preempted by ERISA or do not invalidate the orders. We also find that the unvalued retirement accounts theory is a new argument not raised by Morgan in the trial court. This deprived the trial judge, and Christina, from addressing the issue and resolving any factual questions related to it. Morgan cannot for the first time raise this question on appeal. We therefore affirm.

## II. BACKGROUND

Relevant to this appeal are three aspects of the judgment that divided the community estate. The most contentious issue is the use of QDROs to assign Morgan's retirement assets to Christina. For clarity, there are four pensions or savings accounts whose ownership the court assigned using QDROs: 1) Houston Astros, LLC 401(k) Savings Plan, 2) Major League

---

[4] All further undesignated statutory references are to the Family Code.

3

Baseball Players Pension Plan, 3) Houston Astros Non-Uniform Pension Plan, and 4) Tampa Bay Rays 401(k) Plan.[5]

In January 2017, Christina filed a divorce petition. On December 18, 2018, pursuant to a stipulation between Morgan and Christina, the trial court issued a QDRO dividing the parties' community property interests in Morgan's Houston Astros 401(k). Christina received 50 percent of the account balance, with the remaining plan benefits becoming Morgan's separate property. Then, on January 10, 2019, the trial court entered a status only judgment dissolving Morgan and Christina's marriage, leaving for trial a variety of other issues.

On April 19, 2019, the trial court issued another QDRO, again pursuant to the parties' stipulation, equally dividing the community property interest in Morgan's Major League Baseball Player's Pension Plan. Christina received 50 percent of the plan's accrued benefit, with the order designating the remainder as Morgan's separate property.

Almost three years later, in May 2022, the parties participated in a seven-day trial on reserved financial disputes left pending since 2019. The court signed its judgment on December 22, 2022.[6]

The trial court's judgment contained several findings. First, it ordered that the community property interest in Morgan's Houston Astros

---

[5]     The trial court would later find that an additional "IRA and a 401 k [*sic*] were prematurely cashed out by Morgan, resulting in thousands of dollars of taxes and penalties." The court did not further identify those accounts and they are not before us.

[6]     This court affirmed the December 22, 2022 judgment in a separate appeal. (*In re Marriage of DeBenedetti & Ensberg* (Oct. 4, 2024, D081607) [nonpub. opn.].)

Non-Uniform Pension Plan be equally divided by a QDRO.[7]  Second, the trial court found that Morgan breached his fiduciary duty to Christina by mismanaging $3,662,500 of the couple's community property.  As a result, under section 1101, subdivision (g) (§ 1101(g)), the court awarded Christina $1,831,250, to compensate for her half of the community assets that went missing while under Morgan's control.  Third, the trial court awarded Christina $230,000 in attorney fees and costs.  For Morgan's breach of fiduciary duty, the trial judge ordered a $100,000 in attorney fees pursuant to section 1101(g).  And, given Morgan's evasive interrogatory answers during discovery, the trial judge awarded an additional $130,000 in attorney fees for violating Code of Civil Procedure section 2033.220.[8]

On March 17, 2023, several months after the court signed the judgment, Christina filed a request for order (RFO) seeking to enforce the award of $1,831,250 in damages (representing her half of the community property spent by Morgan) and $230,000 in attorney fees.  Christina's RFO sought to accomplish this by requesting four QDROs, each making her their sole beneficiary of a separate retirement plan.  Three of those proposed QDROs represented all of Morgan's remaining interest in the retirement plans previously divided as discussed above (the Houston Astros 401(k), the Major League Baseball Player's Pension Plan, and the Houston Astros Non-

---

[7]    This plan was initially referred to as the Major League Baseball Non-Uniform Pension Plan, but the parties later discovered the correct name was Houston Astros Non-Uniform Pension Plan.

[8]    Code of Civil Procedure section 2033.220, subdivision (a) reads in relevant part that "[e]ach answer in a response to requests for admission shall be as complete and straightforward as the information reasonably available to the responding party permits."

Uniform Pension Plan). The fourth assigned to Christina all of Morgan's Tampa Bay Rays 401(k), which Morgan acquired *after* the parties separated.[9]

After hearing argument from the parties at an April 17, 2023 hearing, the trial judge ruled in Christina's favor, stating its intention to "sign each of the tendered QDROs granting [Christina] 100 percent of the benefits in order to enable her to secure, in part, her share of the marital estate which she was wrongfully deprived of pursuant to my previous decision." The trial court then executed the four QDROs,[10] as well as a findings and order after hearing (FOAH) reflecting the ruling.[11] Morgan's timely appeal from the orders followed.

## III. DISCUSSION

### A. *Standard of Review*

The interpretation of ERISA is a question of law we review de novo. (*Carmona v. Carmona* (9th Cir. 2010) 603 F.3d 1041, 1050.)

### B. *ERISA and Its QDRO Exception*

ERISA is " 'a comprehensive federal scheme for the protection of pension plan participants and their beneficiaries.' " (*In re Marriage of Marshall* (1995) 36 Cal.App.4th 1170, 1174 (*Marshall*).) "Congress enacted ERISA to provide such protection and thus ensure 'the continued well-being

---

[9] Morgan and Christina separated on October 31, 2016.

[10] The trial judge executed three of the QDROs on April 17, 2023. The trial judge filed a notice of completion of the matter on April 25, 2023. The matter then returned to the superior court's Family Division. The private trial judge, however, then executed the fourth QDRO on May 2, 2023, and the FOAH on August 2, 2023. But, when Judge Victor Torres reissued those last two orders on August 22, 2023, he cured any possible jurisdictional defect.

[11] The parties assume the QDROs enforce both the $1,831,250 in community property reimbursement *and* the $230,000 in attorney fees. We assume without deciding that the parties are correct.

and security of millions of employees and their dependents' who rely upon retirement plans."  (*Ablamis v. Roper* (9th Cir. 1991) 937 F.2d 1450, 1453.) "ERISA preempts 'any and all State laws insofar as they may now or hereafter relate to any employee benefit plan' covered by the statute." (*Marshall*, at p. 1174.)

ERISA generally prohibits the assignment or garnishment of retirement plan benefits.  (*Marshall, supra,* 36 Cal.App.4th at p. 1174.)[12] After some courts interpreted this anti-alienation provision as barring enforcement of domestic support orders, Congress amended ERISA with the Retirement Equity Act of 1984 (REA), which created the QDRO exception. (*Marshall*, at p. 1174.)  In doing so, "Congress sought to protect the rights of nonemployee spouses and dependents by allowing state courts to make equitable divisions of property in a divorce or dissolution and provision for support of dependents."  (*In re Marriage of Oddino* (1997) 16 Cal.4th 67, 75.)

Following the amendment, a QDRO could now assign "all or a portion of" the retirement plan benefits to a nonemployee former spouse.  (29 U.S.C. § 1056(d)(3)(B)(i)(I) & (K).)  To qualify as a QDRO, the order must "relate[ ] to the provision of child support, alimony payments, or marital property rights to a . . .  former spouse," and be "made pursuant to a State . . . domestic relations law (including a community property law)."  (29 U.S.C. § 1056(d)(3)(B)(ii).)  This is consistent with the presumption, when interpreting and applying ERISA, that "Congress did not intend to pre-empt areas of traditional state regulation."  (*Metropolitan Life Ins. Co. v. Massachusetts* (1985) 471 U.S. 724, 740.)

---

12    This is often referred to as an anti-alienation clause.

*C.      The QDROs Address Marital Property Rights*

We start with whether reimbursement for community property improperly taken from a marital estate is a marital property right. " '[When] interpreting [ERISA], our task is to construe what Congress has enacted. We begin, as always, with the language of the statute. When looking to the plain language of a statute, we do more than view words or subsections in isolation. We derive meaning from context, and this requires reading the relevant statutory provisions as a whole.' " (*Owens v. Automotive Machinists Pension Trust* (9th Cir. 2009) 551 F.3d 1138, 1144.)

"ERISA does not explicitly define 'marital property rights,' and . . . no federal definition exists for the term." (*Owens v. Automotive Machinists Pension Trust, supra,* 551 F.3d at p. 1144.) Because ERISA requires QDROs to be made pursuant to state domestic relations law, which is a matter of state concern, we "turn to [the underlying] state domestic relations law to determine the meaning of the term 'marital property rights.' " (*Id.* at p. 1145 & fn. 6; see also, *Sosna v. Iowa* (1975) 419 U.S. 393, 404 [the field of domestic relations is "an area that has long been regarded as a virtually exclusive province of the States"].)

California's domestic relations rules include a robust network of community and separate property laws governing marital property rights. (§ 751, et seq.) Under that system, each spouse has an equal right to ownership, management, and control of community property, which is generally all property acquired during the marriage. (§§ 751, 760, 1100, subd. (a).) Statutory protections reflect the importance of guarding community property rights by imposing special duties on each spouse.

One way California does this is by imposing a fiduciary duty on spouses in their management and control of community assets. (§§ 721, subd. (b),

1100, subd. (e).) "A spouse has a claim against the other spouse for any breach of the fiduciary duty that results in impairment to the claimant spouse's present undivided one-half interest in the community estate." (§ 1101, subd. (a).)

Awards of money under section 1101(g), are meant to restore to the aggrieved spouse her or his lost value in community property. "Given that the fiduciary duty recognized under section 1101 is a duty intended to *preserve* each spouse's one-half interest in the community estate [citations], the 50 percent interest awarded under subdivision (g) must be the same 50 percent interest that would be awarded in the overall division of community assets." (*In re Schleich* (2017) 8 Cal.App.5th 267, 286–287.) "The alternative 'amount equal to' remedy under [section 1101,] subdivision (g) [(§ 1101(g) reimbursement)] should be interpreted to achieve the same result as an award of one half the asset itself." (*Schleich*, at p. 287.) "[Section] 1101 remedies 'are essentially . . . reclamation of property placed beyond the reach of the harmed spouse.' " (*Schleich*, at p. 286.) Here, the question before us becomes whether enforcing a section 1101(g) reimbursement of lost community property creates a marital property right which can be enforced through a QDRO aimed at a separate property retirement account.

In answering that query, we first turn to the general definition of "right," which includes "[s]omething that is due to a person by just claim," and "[a] legally enforceable claim that another will do or will not do a given act." (Black's Law Dictionary (12th ed. 2024).) " 'Right is a correlative to duty,' " and a duty to act or forbear creates a right. (*Ibid.*)

Second, we find instructive section 2640 and its predecessor, former Civil Code section 4800.2. Section 2640 addresses the situation in which one spouse's separate property's increased value came from an expenditure by the

9

other spouse. Section 2640, subdivision (c) informs us that, absent an exception not relevant here, "[a] party *shall be* reimbursed for the party's separate property contributions to the acquisition of property of the other spouse's separate property estate during the marriage." (Italics added.)

Case law tells us section 2640 creates a property right in the reimbursement sought by the contributing spouse. (See, e.g., *In re Marriage of Walrath* (1998) 17 Cal.4th 907, 919 ["a contributing spouse has a vested *property right in his or her right to reimbursement*" under § 2640 (italics added)]; *In re Marriage of Witt* (1987) 197 Cal.App.3d 103, 107 [former Civ. Code, § 4800.2 "creates a *new property right* in the contributing spouse" (italics added)]; *In re Marriage of Perkal* (1988) 203 Cal.App.3d 1198, 1202 ["Husband has a *'property right'* to seek reimbursement from Wife" under former Civ. Code, § 4800.2 (italics added)].)

Finally, we find closer examination of section 1101 leads to a similar conclusion regarding creation of property rights. The section 1101(g) reimbursement of property, or its equivalent in money, is to restore to a spouse their one-half community property interest after that interest becomes impaired. (§ 1101, subds. (a) & (g).) A court order pursuant to section 1101(g) provides a spouse with a legally enforceable claim compelling the other spouse to comply with the marital property fiduciary duty. We therefore construe section 1101(g) reimbursement as creating a marital property right. Here, when the trial court issued the challenged orders allowing Christina to recover her section 1101(g) reimbursement against Morgan's retirement accounts, those orders "relate[d] to the provision of . . . marital property rights" and, therefore, qualified as QDROs. (29 U.S.C. § 1056(d)(3)(B)(ii)(I).)

10

Arguing to the contrary, Morgan relies on *Marshall, supra,* 36 Cal.App.4th 1170. In that case, the husband agreed in a marital settlement agreement to hold the wife harmless from any claims regarding their 1987 joint tax return. (*Id*. at p. 1173.) Several years later, the wife had to pay the Internal Revenue Service (IRS) almost $30,000 for the couple's 1987 taxes. (*Ibid*.) After ordering the husband to reimburse the wife, the trial court found that the husband's retirement account was exempt from that obligation pursuant to ERISA and that the wife was not entitled to a QDRO. (*Id*. at pp. 1173–1174.)

The court of appeal in *Marshall* affirmed the trial court's ruling, explaining, "wife received her share of the community interest in husband's pension plans and is not seeking support necessary to her financial security. The annuity account which wife wishes to garnish was confirmed as husband's separate property in 1991. An order to enforce the 1987 tax liability assumed by husband by garnishing that annuity account now would not relate to the provision of 'marital property rights.' The goals of ERISA would be undermined were we to hold otherwise and endorse the garnishment of a divorced pensioner's income for the satisfaction of a collateral obligation assumed by the pensioner in a dissolution judgment issued years earlier." (*Marshall, supra*, 36 Cal.App.4th at p. 1175.)

Morgan correctly identifies several similarities between *Marshall* and the current case. Christina already received her community interest in Morgan's retirement accounts, Christina is not seeking support necessary for her financial security, and Christina is seeking to garnish accounts that have been confirmed as Morgan's separate property. However, the obligation in *Marshall* was different. There, the husband's duty to hold the wife harmless regarding their 1987 tax return arose merely because the husband agreed to

11

assume it. The underlying liability was not the wife's, rather it was owed to a third party, the IRS. On the other hand, Morgan's obligation in this matter was a section 1101(g) reimbursement, which as explained above, is a marital property right owed to Christina as a portion of her community interest. We therefore find *Marshall* distinguishable.

## D.     The QDROs Do Not Implicate ERISA's Anti-alienation Policy

Morgan also claims his breaches were unrelated to retirement and the trial court's orders contravene ERISA's primary purpose of protecting both spouses' expectation of retirement income. Contrary to Morgan's assertion, his breaches were related in part to retirement. Although the trial court did not find Morgan mismanaged or concealed the four retirement accounts at issue, it did find that Morgan prematurely cashed out an IRA and 401(k) "resulting in thousands of dollars in taxes and penalties," and that Christina's "retirement assets today are virtually nil."

Morgan's argument also ignores the purpose of REA, which amended ERISA to protect nonemployee spouses. (See, e.g., *Stewart v. Thorpe Holding Co. Profit Sharing Plan* (9th Cir. 2000) 207 F.3d 1143, 1146 ["The REA was designed to protect the financial security of ex-spouses and dependants after divorce"]; *Ablamis v. Roper, supra,* 937 F.2d at p. 1453 ["REA amended ERISA in an effort primarily to safeguard the financial security of widows and divorcees"]; *Boggs v. Boggs* (1997) 520 U.S. 833, 847 ["one of REA's central purposes . . . is to give enhanced protection to the spouse"].)

More importantly, a QDRO may assign "*all* or a portion of" a retirement plan to an alternate payee. (29 U.S.C. § 1056(d)(3)(B)(i)(I) & (K), italics added.) This demonstrates Congress's willingness to allow domestic relations orders that completely exhaust the employee spouse's retirement benefits. Morgan acknowledges that a child or spousal support QDRO could

dwarf the value of a retirement account but claims that the "all or a portion of" language is limited to support orders. There is no such limitation in the statutory language. For these reasons, we do not see the result in this case as contravening ERISA's purpose.

Morgan further asserts REA was intended to clarify existing law, and that cases leading to its enactment only allowed assignment of retirement benefits to enforce support orders or to divide community property interests in retirement accounts. However, the United States Supreme Court has found that "pre-REA case law" is "not applicable in light of the REA amendments. The QDRO and the surviving spouse annuity provisions[13] define the scope of a nonparticipant spouse's community property interests in pension plans consistent with ERISA." (*Boggs v. Boggs, supra*, 520 U.S. at pp. 849–850.)

Finally, Morgan asserts the preexisting judgment dividing the parties' community property precluded the issuance of the four QDROs. He claims after that judgment, there were no longer any marital property rights and Christina was merely a creditor. Morgan also contends that affirming the postjudgment QDROs will lead to absurd results because it would allow enforcement against a spouse's separate property retirement plan years or even decades after the community property division. But as Morgan acknowledges, ERISA does not prohibit postjudgment QDROs, nor does it designate a specific period in which they must be issued. Rather, QDROs are authorized for child and spousal support (29 U.S.C. § 1056(d)(3)(B)(ii)(I)), which are ongoing obligations that may require enforcement long after a dissolution judgment is entered. The nonemployee spouse is also acting as a

13     REA also amended ERISA's surviving spouse annuity provisions. (*Boggs v. Boggs, supra*, 520 U.S. at p. 843.) Those provisions are not relevant to our analysis here.

creditor in the child and spousal support scenario, indicating no ownership interest in the retirement account is required. And although the December 22, 2022 judgment determined the parties' marital property rights, a subsequent QDRO still "relates to the provision of" those rights when it seeks to enforce them. (29 U.S.C. § 1056(d)(3)(B)(ii)(I).) We therefore find Morgan's reliance on the timing of the orders unconvincing.

We conclude that the orders allowing Christina to recover her section 1101(g) reimbursement against Morgan's retirement accounts were "relate[d] to the provision of . . . marital property rights" and therefore qualified as QDROs. (29 U.S.C. § 1056(d)(3)(B)(ii)(I).)[14]

E.     *The California Laws Morgan Cites are Either Preempted by ERISA or Do Not Invalidate the QDROs*

Morgan argues the challenged QDROs violated California law on several grounds. First, he claims the orders contravene section 2610, which states, "the court shall make whatever orders are necessary or appropriate to ensure that each party receives the party's full community property share in any retirement plan." (§ 2610, subd. (a).) "[W]e can begin, and in this case end, the analysis by simply asking if state law conflicts with the provisions of ERISA or operates to frustrate its objects." (*Branco v. UFCW-Northern California Employers Joint Pension Plan* (9th Cir. 2002) 279 F.3d 1154, 1157.)

As mentioned, ERISA authorizes a nonemployee spouse to "receive *all* or a portion of" the retirement benefits through a QDRO. (29 U.S.C. § 1056(d)(3)(B)(i)(I) & (K), italics added.) Consequently, section 2610 conflicts with ERISA when the obligation under a QDRO exceeds the employee

---

14     Ensberg does not challenge the inclusion of the attorney fees award in the QDROs. We therefore deem that issue waived and do not address it. (*Holden v. City of San Diego* (2019) 43 Cal.App.5th 404, 418.)

spouse's community property interest in the retirement plan.  Under these circumstances, ERISA prevails under its preemption clause.  (29 U.S.C. § 1144(a) [ERISA "supersede[s] any and all State laws insofar as they may now or hereafter relate to any" covered retirement plan].)  Morgan concedes this result in the context of child or spousal support.  The result is no different when the QDRO is based on the provision of marital property rights as is the case here.

Second, Morgan argues the QDROs violate Code of Civil Procedure section 704.115.  That California statute exempts retirement plans from satisfying judgments, with an exception for child, family, or spousal support.  (Code Civ. Proc., § 704.115, subds. (b) & (c).)  Code of Civil Procedure section 704.115 conflicts with, and is therefore preempted by, ERISA's provisions allowing QDROs for the provision of marital property rights.  (29 U.S.C. §§ 1056(d)(3)(B)(ii)(I), 1144(a).)  Code of Civil Procedure section 704.115 therefore does not render the QDROs invalid.

Finally, Morgan argues that his interest in the four retirement plans was separate property because three of the plans were previously divided by the court and he acquired the fourth after the parties separated.  He therefore contends the QDROs constitute a redivision of property in violation of California law.  Morgan also argues the QDROs modified the existing judgment, which the court lacked jurisdiction to do.

15

We disagree with the premises of these claims. The section 1101(g) reimbursement was not a division of marital property.[15] Nor did the trial court modify the existing judgment by issuing the QDROs. Instead, the QDROs merely allowed Christina to *enforce* the existing judgment regarding her marital property rights against the retirement accounts. We therefore see no second division of property or modification of the judgment and reject Morgan's claims in this regard.

E. *The Retirement Accounts' Value Was Never Raised in the Trial Court, Barring Consideration of That Issue on Appeal*

Morgan argues the trial court's assignment of the four retirement accounts to Christina is not supported by substantial evidence because the trial court never valued the retirement accounts. However, the retirement accounts' value was not an issue submitted to the trial court for determination.

" ' "New theories of defense, just like new theories of liability, may not be asserted for the first time on appeal." ' " (*Hewlett-Packard Co. v. Oracle Corp.* (2021) 65 Cal.App.5th 506, 548.) " ' "This rule is based on fairness—it would be unfair, both to the trial court and the opposing litigants, to permit a change of theory on appeal." ' " (*Ibid.*)

Christina's RFO stated, "[t]he purpose of this RFO is to obtain a determination by the Court that the QDROs attached hereto comply with the requirements of ERISA." In her supporting memorandum of points and authorities, Christina alleged "[t]he retirement plans in this case are valued

---

15 Morgan acknowledges this. In his opening brief, Morgan states, "[t]he trial court was correct in noting that damages for breach of fiduciary duty are not a division of property." And in his reply brief, Morgan notes the "important distinction" between "the division of community property and the enforcement of a money judgment," and asserts "[t]his is an enforcement case."

16

at less than the Judgment that Wife was awarded for breach of fiduciary duty."  Morgan never disputed that allegation in his written opposition or during oral argument.  Instead, he, Christina, and the trial court focused on the legal issues of whether the retirement accounts were exempt under ERISA or California law.

Morgan therefore effectively conceded that his interest in the four retirement accounts was worth less than the section 1101(g) reimbursement.  By claiming on appeal that there is insufficient evidence of the accounts' value,  Morgan is asserting a theory of defense to Christina's RFO that was neither presented to nor considered by the trial court.  We therefore decline to consider the sufficiency of the evidence supporting that new theory.[16]

## IV. DISPOSITION

---

[16]  We acknowledge that "the 'contention that a judgment is not supported by substantial evidence' is an exception to the general rule that 'points not urged in the trial court cannot be raised on appeal.' "  (*Nationwide Ins. Co. of America v. Tipton* (2023) 91 Cal.App.5th 1355, 1365.)  But that exception is inapplicable here where the allegedly unsupported theory was never tendered to the trial court for decision.

17

The postjudgment orders are affirmed.  Christina is awarded costs on appeal.


                                                        RUBIN, J.

WE CONCUR:


BUCHANAN, Acting P. J.


    KELETY, J.